## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

UNITED STATES OF AMERICA

v.                                              CASE NO. 3:25cr196-MCR

DEVON MAE WITRYK

_____/

### STATEMENT OF FACTS

This following Statement of Facts is entered into by and between Devon Mae Witryk as Defendant, Valerie Erwin Prevatte as attorney for Defendant, and the United States Attorney for the Northern District of Florida.

On June 30, 2023, at approximately 9:47 am, Air Force Security Forces were dispatched to the visitor center on Eglin Air Force Base to escort a Florida Department of Children and Family Services (DCF) Employee onto the installation. The DCF Investigator stated that DCF had received an anonymous report that a child living on the base had a significant developmental disorder, full body eczema, and other difficulties, and was living in unfavorable conditions with inadequate supervision. The female child was three years and five months old at the time.

The Investigator was escorted to the residence provided in the tip and made contact with Devon Mae Witryk and her husband, Senior Airman Rodney Howlett. Both individuals were asleep when the Investigator arrived at the residence. Witryk

Page 1 of 8

FILED IN OPEN COURT
6/16/26
CLERK, UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

and Howlett let the Investigator inside the home, and the Investigator immediately noticed an overwhelming odor of animal urine, and that the entire house appeared to be in disarray. Witryk and Howlett led the Investigator to the bedroom where the child was located. To gain access to the child's room, Howlett used a knife that was beside the door to unlock and open the door. Howlett claimed that the child would lock herself in her room.

Upon entering the room, Witryk woke the child up. The child was completely naked, with no diaper, and laying on a mattress with some food nearby. She smelled strongly of urine and appeared to have urinated in the bed where she was laying. Her entire body was covered in rashes, open sores, and what appeared to be eczema. Several of the sores appeared to be actively bleeding and there was blood around her ankles.

The Investigator asked the parents why the child had open sores and was bleeding. Witryk stated that she bathed the child with bath bombs from Bath and Body works. She also told the Investigator that she mixed lotion with oral Benadryl and applied the mixture to the wounds. For nutrition, the parents stated they provide some snacks, however, the child was primarily fed with baby bottles. They reported the child gagged at the sight of a spoon or other utensil. After this initial assessment, it was agreed that the child be taken to Emerald Coast Children's Advocacy Center, in Niceville, Florida, for an evaluation.

At the Advocacy Center, a medical evaluation was conducted. The examining nurse noted the child's skin had signs of chronic inflammation, was excoriated, weepy and very red. There were open lesions on her entire body, with specific areas of concern being the right ankle and left posterior leg, near the knee. Her socks were crusted to the child's skin, and it was difficult to remove her socks for fear of opening the crusted areas. The nurse noted the child limped when walking and was guarding her left leg. Her skin exhibited a condition known as lichenification, which occurs when the skin becomes thick and leathery from constant scratching or rubbing. Ultimately the evaluation found that the case suggested negligent supervision, medical neglect, and poor caretaker judgment. It was recommended that the child be evaluated at a Pediatric Emergency Department for eczema exacerbation.

Developmentally, the child was determined to be non-verbal and guarded. During the medical examination, as the nurse removed the socks and inspected the open wounds, the child did not cry or wince in pain. At the time of the initial assessment, the child was not able to communicate meaningfully and purposefully. The child had poor social interaction abilities, poor comprehension and expression, poor play skills, and occasionally had significant behavioral outbursts.

A review of the child's medical history showed that after her birth, she was seen for a newborn check at two weeks old. After that, she was not seen at the clinic

until a two-year wellness check on November 16, 2022. At that appointment, the records reflected Howlett stated that he had concerns for developmental delays/autism and eczema. The child was referred to developmental-behavior pediatrics and prescribed triamcinolone topical ointment. The child started speech therapy on January 17, 2023. The parents told the DCF Investigator that the doctor had not given them referrals for occupational therapy and physical therapy to address her delays. However, the records also reflected that the parents frequently did not bring the child to her appointments, though, and as a result, the child was unable to make consistent progress in therapy due to this. When she did attend therapy, the records reflected the child was usually very dirty and had a bad odor.

Investigators obtained a search warrant from the base search authority as proscribed by the Uniform Code of Military Justice. When they entered the home, they found it smelled strongly of urine from dirty diapers found throughout the house and cat urine, which was the result of eight cats roaming the home and defecating outside of a litter box.

A trashcan was in the living room and was overflowing with used baby wipes, mold-covered juice containers, and other waste. When individuals first entered the home, they noticed gnats and flies, especially in the kitchen.

The child's bedroom was described by members of Howlett's squadron to present the worst conditions in the home. The room was littered with unknown liquid

stains, dirty diapers containing urine and feces, moldy pieces of food, and other trash. There were flies present in the room, most notably in an open food container of tater-tots on the child's bed, which was sitting next to a urine-soiled diaper.

The investigators also found multiple unidentified pills, a prescription bottle labeled "Percocet" with no lid, jewelry cleaning chemicals, and a pocketknife on a desk in the open living area. All of the items on the desk were reasonably accessible by the child, if she was present in that room. In the hallway that adjoined the two bedrooms, there was a pile of four used diapers and used baby wipes. The baby wipes had a brown substance on them which was presumed to be human feces. Children's toys were present in the living areas outside the child's bedroom, suggesting the child was not always confined to the bedroom.

There were eight cats in the house, including four kittens. Witryk agreed to allow Eglin Pet Welfare (an on-base no-kill pet rescue) to take the cats. There was also a guinea pig that investigators initially thought was dead. Its cage was covered in dried feces and urine. There was a large number of flies which had accumulated around the cage.

There was one cat litter box located in the laundry room however, the litter box had not been cleaned and was so full of cat waste that the cats would not use it, evidenced by feces and dried urine stains being observed directly outside the box and around the house.

## ELEMENTS

### Neglect of a Child (Without Great Bodily Harm, Permanent Disability, or Permanent Disfigurement); FL PJI 16.6

(1) The Defendant

  (a) Willfully, or by culpable negligence, failed or omitted to provide the victim with the care, supervision, and services necessary to maintain the victim's physical or mental health; or

  (b) Failed to make reasonable effort to protect the victim from abuse, neglect, or exploitation by another person;

(2) The Defendant was a caregiver for the victim;

(3) The victim was under the age of 18 years; and

(4) Such conduct occurred within the special maritime and territorial jurisdiction of the United States.

Fla. Stat. 827.03(1)(e) defines "neglect of a child" as:

(1) A caregiver's failure or omission to provide a child with the care, supervision, and services necessary to maintain the child's physical and mental health, including, but not limited to, food, nutrition, clothing shelter, supervision, medicine, and medical services that a prudent person would consider essential for the well-being of the child; or

(2) A caregiver's failure to make a reasonable effort to protect a child from abuse, neglect, or exploitation by another.

Neglect of a child may be based on repeated conduct or on a single incident or omission that resulted in, or reasonably could have been expected to result in, serious physical or mental injury, or a substantial risk of death, to a child. Under Fla. Stat. 827.03(1)(d), "mental injury" means injury to the intellectual or psychological capacity of a child as evidenced by a discernible and substantial

impairment in the ability of the child to function within the normal range of performance and behavior as supported by expert testimony.

Under the Florida Pattern Jury Instruction 16.6, "culpable negligence" is defined as "…more than a failure to use ordinary care for others. For negligence to be called culpable negligence, it must be gross and flagrant. The negligence must be committed with an utter disregard for the safety of others. Culpable negligence is consciously doing an act or following a course of conduct that the defendant must have known, or reasonably should have known, was likely to cause death or great bodily harm."

_Valerie Prevatte_
_____
VALERIE ERWIN PREVATTE
Attorney for Defendant


_6·16·26_
_____
Date


_Devon Witryk_
_____
DEVON MAE WITRYK
Defendant

_6·16·26_
_____
Date

JOHN P. HEEKIN
United States Attorney

_____ (for)
MEREDITH L. STEER
South Carolina Bar No. 105392
Assistant United States Attorney
Northern District of Florida
111 N. Adams Street, Fourth Floor
Tallahassee, FL 32301
meredith.steer@usdoj.gov


_6/16/2026_
_____
Date